**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:22-cv-02201-PAB-MEH

DANIELLE JURINSKY, individually and on
behalf of all others similarly situated,

Plaintiff,

     v.

ARAPAHOE COUNTY DEPARTMENT
OF HUMAN SERVICES, DIVISION OF
CHILD AND ADULT PROTECTION
SERVICES, ROBIN NICETA,
MICHELLE DOSEY, AND THE
ARAPAHOE COUNTY BOARD OF
COUNTY COMMISSIONERS

     Defendants.

---

## AMENDED CIVIL COMPLAINT AND JURY DEMAND
---

     Plaintiff Danielle Jurinsky ("Plaintiff"), by and through her undersigned counsel, CONDUIT LAW, LLC, and on behalf of all others similarly situated, hereby submits the following Amended Civil Complaint and Jury Demand and asserts as follows:

### <u>INTRODUCTION</u>

     1.    Through the activities and conduct of Defendants, Arapahoe County families have been torn apart, sometimes permanently, on the basis of constitutionally improper investigations, false sworn testimony by Arapahoe County employees, and fabricated evidence introduced by Arapahoe County employees in both investigatory and judicial proceedings.

1

2.      Defendants have not only violated the United States Constitution and federal law, but in doing so have also, through their actions in baselessly separating or attempting to separate children from their parents or caretakers, caused unspeakable trauma to many individuals throughout Arapahoe County, including children, their parents, and other caretakers alike.

3.      On top of the trauma of having their life's treasures – their children – taken or nearly taken from them, some parents or other caretakers have been silenced, through improper protection orders, or in some cases jailed for speaking out against or otherwise fighting Defendants' conduct.

4.      Defendants' activities and conduct in the course of these investigations flagrantly violate state and federal law, including the United States Constitution and its guarantees of equal protection and due process under the law.

## PARTIES, JURISDICTION, AND VENUE

5.      At all times relevant to this action, Plaintiff resided in Colorado.

6.      Upon information and belief, at all times relevant to this action, Defendant Arapahoe County Department of Human Services, Division of Child & Adult Protection Services, ("Defendant ACDHS") is a county governmental agency whose "mission is to build strong communities by promoting the safety, independence **and stability** of individuals **and families**" (emphases added) and which is located at 14980 E. Alameda Dr., Aurora, CO 80012.

7.      Upon information and belief, at all times relevant to this action, Defendant Michelle Dossey (hereinafter, "Defendant Dossey"), was and is the Division Manager of the

Arapahoe County Department of Human Services, Division of Child & Adult Protection Services, which is located in Arapahoe County at 14980 E. Alameda Dr., Aurora, CO 80012.

8.    Upon information and belief, at all times relevant to this action, Defendant Robin Niceta (hereinafter, "Defendant Niceta") was an employee of Defendant ACDHS, which is located at 14980 E. Alameda Dr., Aurora, CO 80012.

9.    Upon information and belief, Defendant Arapahoe County Board of County Commissioners ("Defendant BOCC") is a governing body of five individuals who "serve as the legislative, governing and administrative body for Arapahoe County."  Defendant BOCC "oversees county departments, hires the management team, [and] administers county services," amongst other responsibilities, and is located at 5334 S. Prince St., Littleton, CO 80120.

10.    The Court has subject matter jurisdiction over this account pursuant to (a) 28 U.S.C. § 1441(a), as Defendants have voluntary removed this case to this Court and (b) 28 U.S.C. § 1331, as this is a civil action arising under the Constitution and laws of the United States.

11.    Venue for this action is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391(b) as Defendants all reside in this judicial district and the events giving rise to these claims all occurred in this judicial district.

## ALLEGATIONS REGARDING DEFENDANT ACDHS

12.    As stated on its website, Defendant ACDHS is tasked with receiving reports of child abuse and neglect.

13.    Defendant ACDHS states that it "works with families to identify and resolve concerns for children's safety and well-being."

14.     Defendant ACDHS further states that its "goal is to strengthen families and ensure the safety, well-being and permanency of every child."

15.     However, through its actions, Defendant ACDHS has, on occasion, not strengthened families and have instead destroyed Arapahoe County families by baselessly and unconstitutionally separating or attempting to separate children from their parents or caretakers.

16.     In baselessly and unconstitutionally separating or attempting to separate children from their parents or caretakers, Defendant ACDHS has negatively impacted the well-being of children and their parents or caretakers.

17.     In baselessly and unconstitutionally separating or attempting to separate children from their parents or caretakers, Defendant ACDHS has de-stabilized the lives of these children and their parents or caretakers and have not promoted the permanency of families within Arapahoe County.

18.     According to internal correspondence issued by Cheryl Ternes, Director of Defendant ACDHS, Defendant ACDHS "received more than 24,000 calls [in 2021] to our child and adult protection hotline."

19.     According to this same correspondence, Defendant ACDHS, through its caseworkers, "routinely serve those most vulnerable within our community **with the highest levels of professionalism and compassion**."  (Emphasis added.)

20.     However, Defendant ACDHS, through its employees, independent contractors, or other agents, has

- repeatedly failed to conduct adequate, thorough, and constitutional investigations of child abuse and neglect complaints, which deprive parents and caretakers of their rights of due process and equal protection under the law;

- intentionally and knowingly failed to consider the testimony of individuals who would be intimately familiar with a subject child's wellbeing including relatives, teachers, friends, or other close associates;

- introduced false testimony at judicial proceedings regarding the separation or attempts to separate children from their parents or caregivers;

- intentionally or recklessly ignored express, written allegations regarding the falsity of a child abuse and neglect complaint;

- intentionally and knowingly failed to report allegations regarding the falsity of a child abuse and neglect complaint to law enforcement authorities;

- knowingly and intentionally altered statements and translations of statements of critical witnesses such as parents, caretakers, and their relatives, friends, colleagues, or other associates during the course of investigatory or judicial proceedings;

- knowingly and intentionally retained purported, out-of-state experts for the sole purpose of separating or attempting to separate children from their parents and caretakers;

- knowingly and intentionally ignored the findings and conclusions of other experts, including medical experts, who expressly and in writing disagreed with Defendant ACDHS' recommendations and conclusions;

5

- knowingly and intentionally modified internal open investigations in the TRAILS system in order to separate or attempt to separate children from their parents or caretakers; and

- silenced, attempted to silence, and/or internally conspired to silence, through improper restraining orders, or otherwise refused to hear, in the course of investigatory proceedings, individuals who protest or otherwise fight against the separation or attempted separation of children from their parents or caregivers.

21.     In making false complaints, testifying falsely in judicial proceedings, introducing false and/or misleading evidence in investigatory and judicial proceedings, and engaging in other conduct, Defendant ACDHS has not served the community with professionalism.

22.     In separating or attempting to separate children from their parents or caretakers on the basis of false complaints, testimony, or evidence, Defendant ACDHS has not served the community with compassion.

23.     Finally, according to the same correspondence quoted above, Defendant ACDHS "also takes allegations of false reporting seriously – especially when they involve employees."

24.     Yet, when presented with express and written allegations of false reporting, Defendants have failed to immediately (or ever) refer these allegations to the appropriate law enforcement authorities or conduct any internal investigation regarding the veracity of such allegations and the related abuse or neglect complaint.

## ALLEGATIONS REGARDING DEFENDANT NICETA

25.     During the course and scope of her former employment with Defendant ACDHS, Defendant Niceta baselessly, falsely, and unconstitutionally separated or attempted to separate children from their parents or caretakers.

26.     Defendant Niceta's relevant actions include, but are not limited to:

•       knowingly, and while still an employee of Defendant ACDHS, making false abuse or neglect complaints to Defendant ACDHS about parents or caretakers in order to separate or attempt to separate children from their parents and caretakers;

•       intentionally attempting to improperly influence the outcome of ACDHS investigations by asking that certain complaints in which she had a personal interest be assigned to her;

•       intentionally attempting to improperly influence the outcome of ACDHS investigations by accessing open investigations not assigned to her;

•       intentionally and improperly influencing the outcome of judicial proceedings regarding the separation or attempt to separate children from their caretakers by conspiring with or inducing other ACDHS employees to offer false testimony;

•       knowingly and intentionally introducing false testimony into judicial proceedings regarding the separation or attempt to separate children from their parents or caretakers;

•       offering alcoholic beverages to parents and caretakers involved in going investigations with the specific intent of initiating a sexual relationship and then turning against such parents and caretakers when they refused her offers of alcoholic beverage and sexual advances; and

7

- knowingly and intentionally introducing false evidence, including fabricated investigative reports, conclusions, and altered statements of parents, caretakers, and other witnesses into investigatory and judicial proceedings regarding the separation or attempt to separate children from their caretakers.

## ALLEGATIONS REGARDING DEFENDANT DOSSEY

27.    During the course and scope of her employment with Defendant ACDHS, which includes the supervision of Defendant ACDHS's employees, Defendant Dossey is equally liable for baseless and unconstitutional separations or attempts to separate children from their parents or caretakers.

28.    Defendant Dossey's relevant actions include, but are not limited to:

- intentionally failing to consider all evidence related to a complaint of child abuse or neglect and intentionally leaving such evidence out of the ultimate determination made about a complaint of child abuse or neglect;

- unlawfully seeking a restraining order against a parent in an attempt to silence a parent who was affected by Defendants' separation her from her child;

- preventing parents or other caretakers from protesting or otherwise fighting against the removal or attempted removal of their children such as by intentionally scheduling meetings outside the presence of their parents or caretakers;

- retaining purported out-of-state experts with the knowledge and intent that such witnesses will only support Defendants' decision to separate children from their parents or caretakers;

8

- intentionally ignoring other experts, including medical experts, who expressly disagreed with a decision to separate a child from his or her parents or caretakers; and

- conspiring with other individuals, including during internal meetings, in order to silence or otherwise prevent them from fighting against the removal or attempted removal of a parent or caretaker's child or children.

## ALLEGATIONS REGARDING DEFENDANT BOCC

29.     Defendant BOCC's Organizational Chart notes that Defendant BOCC directly supervises, directs, and oversees all Arapahoe County Departments, including Defendant ACDHS:

30.     Pursuant to C.R.S. § 30-11-107, Defendant BOCC has the explicit and "exclusive power to adopt the annual budget for the operation of the county government, including all offices, departments, boards, commissions, other spending agencies of the county government, and other agencies which are funded in whole or in part by county appropriations."

31.     Defendant ACDHS and, by extension, Defendants Dossey and Niceta, are subject to Defendant BOCC's authority and control.

32.     The actions and conduct described above all occurred within the course and scope of Defendant ACDHS's, Defendant Niceta's, and Defendant Dossey's agency relationship with Defendant BOCC.

33.     Defendant BOCC is legally and jointly liable for the conduct of all other Defendants.

## ALLEGATIONS OF INDIVIDUAL CLASS MEMBERS

34.     Although discovery has not yet even been initiated, multiple class members have demonstrated the commonality of the putative class as well as the patterns and practices of Defendants which violate 42 U.S.C. § 1983 as well other actions of Defendants which violate the the U.S. Constitution

35.     The allegations of the following individual class members do not represent the entire putative class and Plaintiff reserves the right to seek the inclusion of additional individuals as discovery progresses and the putative class is certified.

## ALLEGATIONS OF CLASS REPRESENTATIVE

36.     In or about January 2022, Defendant ACDHS unconstitutionally attempted to separate Class Representative Danielle Jurinsky (Class Representative) from her son.

37.    On or about January 28, 2022, Defendant Niceta placed an anonymous call to Defendant ACDHS in which she alleged that she witnessed Class Representative sexually abusing her son on two occasions.

38.    Upon information and belief, Defendant Niceta made the call in the course and scope of her employment with Defendant ACDHS, as documents obtained pursuant to a Colorado Open Records Act ("CORA") indicate that Defendant Niceta was working for Defendant ACDHS on the date she made the complaint:

**Theresa Smith**

| | |
|---|---|
| From: | Carrie Gillit |
| Sent: | Thursday, May 12, 2022 9:31 AM |
| To: | Michelle Dossey |
| Subject: | FW: 1.31.22.xlsx |
| Attachments: | 1.31.22.xlsx |

It looks like she was showing as a participant for RT 10 that afternoon.



ARAPAHOE COUNTY

Carrie Gillit
Intake Administrator
Human Services
Child and Adult Protection Services
14980 E Alameda Dr | Aurora, CO 80012
O: 303-636-1741 | C: 303-328-1445
arapahoegov.com
Facebook | Twitter | Instagram | Nextdoor | Youtube

| 10 | Christiana Fladen | Facilitator | 3261315 | |
|---|---|---|---|---|
| | Robin Niceta | | 3261385 | |
| | Shannon Hicks | | 3261413 | |
| | Aimie Ingalls | | 3261431 | |

11

39.     Having received extensive training on receiving and referring calls such as this one, Defendant Niceta knew exactly the false information she had to provide in order to trigger a "referral," which would open up a full investigation to be conducted by Defendant ACDHS.

40.     Defendant Niceta alleged that she witnessed the incidents in one of Class Representative's restaurants.

41.     At no point in its investigation did Defendant ACDHS ever attempt to inquire who these witnesses were.

42.     At no point in its investigation did Defendant ACDHS ever attempt to interview either the tipster (Defendant Niceta) or any of the other alleged witnesses to the incidents.

43.     Defendant Niceta provided an outdated address for Class Representative.

44.     At no point in its investigation did Defendant ACDHS ever attempt to investigate why the anonymous tipster provided an outdated address for Class Representative or consider this critical piece of evidence in its investigation.

45.     Shortly after Defendant Niceta anonymously contacted Defendant ACDHS, Defendant ACDHS contacted Class Representative.

46.     Upon hearing the patently false allegations made against her, Class Representative immediately informed Defendant ACDHS that the allegations were likely made in retaliation against Class Representative, who is an elected official.

47.     Class Representative provided the name of at least one individual who she believed could have made the false reports.

48.     Despite having this information, Defendant ACDHS failed to turn over these allegations regarding false reporting to the appropriate law enforcement authorities.

49.     Defendant ACDHS also failed to investigate the individual that the Class Representative identified as an individual who could have potentially made the false reports.

50.     Documents obtained pursuant to the CORA request reveal that Defendant ACDHS knew that, concurrent with its investigation, Class Representative had publicly criticized then-Aurora Police Chief Vanessa Wilson.

51.     Documents obtained pursuant to the CORA request also reveal that Defendant ACDHS knew that, concurrent with its investigation, then-Chief Wilson was engaged in an intimate relationship with one of Defendant ACDHS's employees, Defendant Niceta.

52.     Despite knowing that (a) Class Representative immediately reported to Defendant ACDHS that the false, anonymous tip was likely made in retaliation against Class Representative; (b) Class Representative had very recently publicly criticized then-Chief Wilson; (c) then-Chief Wilson was, at the time that the anonymous tip was made, intimately involved with one an employee of Defendant ACDHS, Defendant Niceta, Defendant ACDHS failed to conduct any internal investigation regarding Defendant Niceta's involvement in the false, anonymous tip.

53.     Upon information and belief, the day after making the false, anonymous tip, Defendant Niceta, in her official capacity, attempted to interfere with the investigation when she requested that this investigation be assigned to her.

54.     Upon information and belief, during the pendency of the investigation, Defendant Niceta, in her official capacity, either accessed or attempted to access – for the

purposes of altering, destroying, or fabricating evidence – Defendant ACDHS's investigatory file and other documents associated with its internal reporting system ("Trails").

55.    Based upon the above allegations, Defendant ACDHS and Defendant Niceta violated Class Representative's civil rights, right to due process, and right to equal protection.

56.    Defendant ACDHS' actions related to Class Representative share common issues of both law and fact when compared with its actions related to every other member of the putative class including, but not limited to, unconstitutional attempts to alter the veracity of an investigation, unconstitutional attempts to separate Class Representative from her child, violations of both substantive and procedural due process regarding the many errors Defendant ACDHS made during the course of its investigation, and Defendant's differential treatment of Class Representative when compared with other targets of Defendant ACDHS investigations.

## ALLEGATIONS OF PUTATIVE CLASS MEMBER J.A.

57.    In or about September 2019, Defendant ACDHS unconstitutionally separated Putative Class Member J.A. from her two children.

58.    Defendant Niceta, in the course and scope of her employment with Defendant ACDHS, was assigned to investigate J.A.

59.    Defendant ACDHS initially investigated J.A. and her family after J.A. reported to law enforcement authorities that J.A.'s son may have sexually assaulted J.A.'s daughter.

60.    Defendant Niceta's interactions with J.A. and her mother were immediately unprofessional and hostile.

61.    As a result of Defendant's Niceta's unprofessional and hostile conduct, J.A. asked Defendant Niceta to be respectful in her interactions with both J.A. and her mother.

62.     Because J.A. questioned Defendant Niceta's unprofessional and hostile conduct, Defendant Niceta immediately began taking all steps possible to discredit J.A., separate J.A. from her children, and instead ensure that custody was given to J.A.'s ex-partner, who had open federal drug trafficking charges.

63.     Defendant Niceta also worked to place the children with J.A.'s ex-partner even though J.A. showed Defendant Niceta pictures and other evidence of J.A.'s ex-partner physically abusing her.

64.     Extensive forensic interviews at SungateKids with J.A.'s daughter determined that J.A.'s son did, in fact, sexually assault J.A.'s daughter.

65.     Additionally, law enforcement authorities confirmed that J.A.'s son sexually assaulted J.A.'s daughter.

66.     Without any basis – legal, factual, or otherwise – Defendant Niceta discredited the forensic interviewing of J.A.'s daughter.

67.     Without any basis – legal, factual, or otherwise – Defendant Niceta discredited the conclusions of law enforcement officers.

68.     Defendant Niceta repeatedly and falsely, without any basis – legal, factual, or otherwise – testified in open court that J.A. made false statements regarding the underlying sexual assault.

69.     Defendant Niceta also intentionally interfered with the veracity of the investigation by forcing J.A.'s children to later change their story and state that the sexual assault had never occurred when it, in fact, had occurred.

70.     Defendant Niceta undertook the above actions in a specific effort to take revenge on J.A. for criticizing Defendant Niceta's professionalism and separate J.A. from her children even though J.A. was the one who had voluntarily brought the sexual assault to the attention of governmental authorities.

71.     Based upon the above allegations, Defendant ACDHS and Defendant Niceta violated J.A.'s civil rights, right to due process, and right to equal protection.

72.     Defendant Niceta and, as a result of her employment with Defendant ACDHS, Defendant ACDHS's actions related to J.A. share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of J.A. from her children.

## ALLEGATIONS OF PUTATIVE CLASS MEMBER T.B.

73.     In 2020, Defendant ACDHS unconstitutionally attempted to separate Putative Class Member T.B. from his children.

74.     On or about April 11, 2020, the non-custodial parent of one of T.B.'s children drove to his address in Colorado and unlawfully made contact with one of his children.

75.     After making this initial contact, the non-custodial parent of one of T.B.'s children kidnapped the child.

76.     In fact, this was not the first time that the non-custodial parent had kidnapped one of T.B.'s children.

77.     After reporting the missing child and suspected kidnapping, law enforcement authorities eventually tracked down T.B.'s child to the non-custodial parent's residence in Mississippi.

78.     Immediately after being released from custody, the non-custodial parent made contact with Defendant ACDHS and made a number of patently false allegations about T.B., including outlandish allegations that T.B. was a drug addict and gang member.

79.     As a result of these patently false allegations, Defendant ACDHS began investigating T.B.

80.     Defendant ACDHS failed to identify any information supporting the non-custodial parent's false allegations.

81.     Despite knowing that such allegations were made by the same individual who had just kidnapped one of T.B.'s children, Defendant ACDHS failed to investigate the veracity of the non-custodial parent's claims.

82.     Caseworker Kayleigh Boveri, in the course and scope of her employment with Defendant ACDHS, knowingly and falsely testified in open court that she had conducted a formal background investigation of T.B. and determined that he had committed several major crimes, including murder, when T.B. had never committed any of these crimes.

83.     Caseworker Kayleigh Boveri, in the course and scope of her employment with Defendant ACDHS, knowingly and falsely testified in open court that the non-custodial parent who had just kidnapped one of T.B.'s children, in fact, had and was entitled to custody of the child.

84.     Caseworker Boveri also overtly laughed at T.B. when she provided him notice of the dependency and neglect hearing just 48 hours before it was set to occur.

85.     Caseworker Boveri's false testimony caused all criminal charges brought against the non-custodial parent to be dropped.

86.     Caseworker Boveri's patently false testimony caused immense trauma to T.B. and his family including, but not limited to, the fact that her testimony freed the same non-custodial parent who had repeatedly kidnapped one of T.B.'s children.

87.     Defendant ACDHS subsequently terminated Caseworker Boveri in or about December 2020.

88.     Based upon the above allegations, Caseworker Boveri and Defendant ACDHS violated T.B.'s civil rights, right to due process, and right to equal protection.

89.     Defendant ACDHS's actions related to T.B. share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional attempt to separate T.B. from his children.

## ALLEGATIONS OF PUTATIVE CLASS MEMBER B.C.

90.     In 2020, Defendant ACDHS unconstitutionally separated Putative Class Member B.C. from several children which were in B.C.'s care.

91.     B.C. has served as an outstanding foster and adoptive mother to numerous children over the past several years and most recently agreed to care for *four* siblings, including a baby.

92.     Defendant Niceta was assigned to investigate B.C.'s care of these four children, but the investigation eventually threatened to separate B.C. from her own three children, including two biological children and an adopted child, even though it only initially involved.

93.     During the course of her investigation, Defendant Niceta showed B.C. a picture of one of the children's father which was actually a "mug shot."

94.     B.C. questioned Defendant Niceta why she was showing B.C. a mug shot instead of a normal photograph of the father.

95.     Additionally, as she did with Putative Class Member J.S., Defendant Niceta offered alcoholic beverages to B.C. during the course of the investigation.

96.     B.C. declined Defendant Niceta's offer for alcoholic beverages.

97.     As a result of B.C. apparently questioning her professionalism and declining Defendant Niceta's offer of alcoholic beverages, Defendant Niceta immediately undertook efforts to remove all of B.C.'s children from her care.

98.     During the course of the investigation, Defendant Niceta unilaterally scheduled a visit with the baby in B.C.'s care and the baby's alleged biological father then falsely alleged that she had sent B.C. an email about the visit.

99.     In fact, the only email Defendant Niceta sent about the visit was sent three days after the visit occurred.

100.    Defendant Niceta made a surprise visit to B.C.'s home on or about October 19, 2020.

101.    Without having any type of warrant or other specific judicial authorization to do so, Defendant Niceta removed four of B.C.'s children to "take them to the park."

19

102.    In subsequent court proceedings, Defendant Niceta falsely testified that she observed bruising on the children.

103.    At no point in her investigation or in any court proceedings did Defendant Niceta or Defendant ACDHS ever present any evidence, including photographs, of any abuse or neglect of B.C.'s children, including bruising.

104.    At a subsequent court proceeding, Defendant Niceta falsely testified that she did not take photographs of the alleged bruising on B.C.'s children because she did not have her mobile phone with her on the date she made a surprise visit to B.C.'s home to temporarily and unlawfully remove her children.

105.    This testimony is false because on the same date Defendant Niceta later testified that she did not have her mobile phone and therefore could not take pictures of bruising, Defendant Niceta sent and received several text messages to and from B.C. including text messages from Defendant Niceta to B.C. asking B.C. where two other children were.

106.    Defendant Niceta's testimony regarding bruising on B.C.'s children are also demonstrably false because the children had just met with their various therapists shortly before Defendant Niceta's surprise visit and the therapists had confirmed that all of B.C.'s children were receiving adequate care, including medical care, and did not have any bruising.

107.    Defendant Niceta also testified that B.C. was not providing medical care for the children when B.C. produced a list of ten witnesses as well as hundreds of pages of medical records proving that she was, in fact, providing medical care to the children.

20

108.     Additionally, Defendant Niceta falsely testified that she did not have an opportunity to review the underlying investigative report but later in her testimony referred to a fact only raised in the investigative report, thereby proving that she had, in fact, reviewed it.

109.     Defendant Niceta also falsely testified that one of the individuals with whom one the children was placed had no criminal background when in fact he did, proving that Defendant Niceta either falsely testified that she had performed a background check when she did not or that she knowingly falsified the results of the background check.

110.     After unconstitutionally separating B.C. from the children in her care, Defendant ACDHS split up the children – all siblings – and placed them all over the country, including the State of West Virginia and the State of Pennsylvania.

111.     Upon information and belief, Defendant Niceta informed one of the families that one of the children was going to be removed and placed with them even before the permanent removal order had been entered.

112.     Defendant Niceta advised B.C. that one of the children was being placed with the child's biological father, but no DNA test was ever submitted in judicial proceedings, proving that Defendant Niceta either falsified that she had performed a DNA test when she, in fact, had not or that Defendant Niceta falsified the results of the DNA test and intentionally failed to produce it because it would have proven that the individual was not the child's biological father.

113.     Defendant ACDHS purchased the airline ticket used to send the baby in B.C.'s care to West Virginia even before the baby had formally been removed from B.C.'s care.

21

114.    At the time of their permanent removal, B.C. had been taking care of the children for years and had even begun completing adoption paperwork with Defendant Niceta's assistance.

115.    As a result of the trauma inflicted upon B.C. by Defendant Niceta and Defendant ACDHS, B.C. lost all of her top teeth and her hair began falling out.

116.    Defendant ACDHS is currently garnishing B.C.'s wages to pay for medical treatment for the children which Defendant ACDHS unlawfully and unconstitutionally removed from B.C.'s care.

117.    Defendant ACDHS also improperly garnished benefits intended for B.C. to take care of another child.

118.    Based upon the above allegations, Defendant Niceta and Defendant ACDHS violated B.C.'s civil rights, right to due process, and right to equal protection.

119.    Defendant Niceta and Defendant ACDHS's actions related to B.C. share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of B.C. from four children in her custody and care.

## ALLEGATIONS OF PUTATIVE CLASS MEMBER C.Ch.

120.    In 2012 and 2013, Defendant ACDHS unconstitutionally separated Putative Class Member C.Ch. from her children.

121.    As Defendant ACDHS's unconstitutional separation of C.Ch. from her children is ongoing as of the date of this filing and the children are still minors, Defendant ACDHS's violation is an ongoing constitutional violation.

22

122.    C.Ch. and her fiancée arrived in Greenwood Village, Colorado in order to start a business after relocating from Florida.

123.    During their trip, C.Ch. and her family stayed in a motel.

124.    Upon arriving in Colorado, C.Ch. and her family initially rented a house but C.Ch. was forced to call law enforcement authorities regarding her landlord, who had illegally planted recording devices and other security devices in the home.

125.    Additionally, once they arrived in Colorado, the motel at which they had stayed prior to renting this house in Colorado contacted law enforcement authorities and wrongly accused C.Ch. of underpaying their bill.

126.    As a result, upon leaving the house which they had rented, law enforcement authorities arrested C.Ch. and her fiancée while her fiancée's mother and their two sons were in the car.

127.    C.Ch.'s fiancée was charged with a petty offense and was able to bond out that evening.

128.    Defendant ACDHS began an investigation because C.Ch. and her fiancée were wrongfully arrested and briefly incarcerated.

129.    The investigation did not consider placement with C.Ch.'s fiancée's mother.

130.    The investigation did not consider placement with the business partners of C.Ch. and her fiancée even though the business partners offered to take temporary custody of the children.

131.    Instead, Defendant ACDHS used the brief, wrongful incarceration of C.Ch. and her fiancée to, eventually, permanently remove her children from the custody and care of C.Ch. and her fiancée.

132.    Defendant ACDHS also used this brief, wrongful incarceration of C.Ch. and her fiancée in order to later influence another county to remove C.Ch.'s newborn daughter from her care and custody as C.Ch. became pregnant towards the end of Defendant ACDHS's initial investigation.  At the time of the removal of C.Ch.'s newborn baby, C.Ch. and her fiancée were allowed unsupervised visits with their two sons who were eventually separated from her.

133.    Two of C.Ch.'s children were eventually adopted out to other families and the third was given to the custody of C.Ch.'s ex-husband.

134.    Defendant ACDHS failed to provide any substantive or procedural due process to C.Ch. before separating her from her children including, but not limited to, providing any notice of the potential separation, allowing C.Ch. to advocate for keeping her children in her care, or making any meaningful attempt to maintain the stability of C.Ch.'s family.

135.    Defendant ACDHS wrongfully removed C.Ch.'s children from her custody and care even though both C.Ch. and her fiancée complied with every single request made by Defendant ACDHS including drug testing.

136.    When C.Ch. would test negative on her drug tests, Defendant ACDHS falsely accused C.Ch. of "altering" the results even though she completed the tests at court-approved facilities and had no ability to impact the test results.

137.    Once C.Ch. and her fiancée were released from their wrongful incarceration, they asked their assigned caseworker employed by Defendant ACDHS for their case-related

paperwork but were told that this evidence had been lost, destroyed, or was otherwise unavailable.

138.    Upon information and belief, Defendant ACDHS either intentionally destroyed or intentionally made these documents unavailable to C.Ch. in an effort to separate C.Ch.'s children from her.

139.    Upon information and belief, other individuals whom Defendant ACDHS has investigated in dependency and neglect cases have not had their children taken away solely because their parents were wrongfully arrested.

140.    Upon information and belief, other individuals whom Defendant ACDHS has investigated in dependency and neglect cases have not had case-related paperwork lost, destroyed, or otherwise made unavailable solely because these individuals were briefly incarcerated.

141.    Based upon the above allegations, Defendant ACDHS violated C.Ch.'s civil rights, right to due process, and right to equal protection.

142.    Defendant ACDHS's actions related to C.Ch. share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of C.Ch. from her three children.

## ALLEGATIONS OF PUTATIVE CLASS MEMBER C.Ci.

143.    In February 2021, Defendant ACDHS unconstitutionally separated Putative Class Member C.Ci. from her stepson.

144.    At the time of the permanent separation of C.Ci. from her stepson, C.Ci. was caring for a boy whose biological mother, who was also C.Ci.'s ex-partner, had died.

145.     The boy's biological mother (and C.Ci.'s ex-partner), expressed in writing to Defendant ACDHS before her death that she wished for C.Ci. to serve as her son's sole caretaker.

146.     Prior to her passing but while an investigation regarding C.Ci. was ongoing, when the boy's biological mother expressly told Defendant ACDHS that she wished for the boy to be in C.Ci.'s custody and care, Defendant ACDHS falsely accused the boy's biological mother of having a mental illness, asked the Court to appoint a guardian *ad litem* for her with the intent of ensuring that would not be able to speak in judicial proceedings, and also falsely accused C.Ci. of "controlling" or "manipulating" her ex-partner and the boy's biological mother.

147.     Defendant ACDHS also intentionally ignored that the boy's biological mother had given C.Ci. extensive parenting rights over the boy including medical and educational decision-making authority.

148.     In an effort to harass C.Ci. and her ex-partner, C.Ci.'s ex-partner's mother made repeated false complaints to Defendant ACDHS.

149.     Defendant ACDHS failed to investigate the veracity of these complaints when it opened a dependency and neglect case regarding C.Ci.'s stepson.

150.     Defendant Dossey supervised the caseworker assigned to C.Ci.'s investigation.

151.     Defendant ACDHS falsely accused C.Ci. of drugging her stepson despite having no documentation or evidence – medical or otherwise – to support this allegation.

152.    Despite caring for her stepson and forming a strong, parental bond with him, Defendant ACDHS intentionally excluded C.Ci. from seeking ongoing custody of the boy.

153.    For example, after providing several available dates for a "family meeting," Defendant ACDHS intentionally scheduled the meeting at the last minute and during a date and time that C.Ci. had expressly said she would be unavailable so that C.Ci. was unable to attend.

154.    On at least one other occasion, Defendant ACDHS intentionally scheduled a critical case-related meeting during a time in which C.Ci. had expressly told Defendant ACDHS that she was unavailable.

155.    During this meeting, several individuals who supported C.Ci.'s ongoing care of her stepson were present and witnessed Defendant Dossey making known her intentions to prevent C.Ci.'s involvement in the case.

156.    Numerous friends and colleagues of C.Ci. made oral and written statements to Defendant ACDHS in order to help her keep custody of the boy, but Defendant ACDHS intentionally rejected all of them without providing any reason.

157.    Several of these witnesses were mandatory abuse reporters, including at least two educators, but Defendant ACDHS intentionally rejected all of them without providing any reason.

158.    In fact, Defendant ACDHS knowingly and intentionally falsified and altered the statements of C.Ci.'s mother and father when they were interviewed by Defendant ACDHS.

27

159.    Defendant Dossey received several of these communications and violated
C.Ci.'s constitutional protections by failing to consider them and/or intentionally rejecting
them in a knowing effort to separate C.Ci. from her stepson.

160.    Defendant Dossey also expressly told C.Ci., early on in the investigation, that
C.Ci. would never gain custody of her stepson.

161.    Despite having no evidence of C.Ci.'s mental instability, Defendant ACDHS
forced C.Ci. to undergo a sham "parental capacity evaluation."

162.    As the result of a *single*, 30-minute *Zoom* appointment with a purported mental
health expert, Defendant ACDHS and its retained expert falsely diagnosed C.Ci. with
Munchausen by proxy.

163.    The "expert" Defendant ACDHS retained to "evaluate" C.Ci. refused to let
C.Ci. be heard during the brief meeting and expressly told her that she believed C.Ci.
physically abused her partner and stepson without any evidence – physical, medical, or
otherwise – to opine as much.

164.    Defendant ACDHS and Defendant Dossey conspired with this expert to ensure
that the expert would issue a diagnosis which would falsely discredit C.Ci.'s mental health in
order to portray her as an unfit stepparent.

165.    C.Ci. frequently wrote to Defendant ACDHS employees, including Defendant
Dossey, regarding her dissatisfaction with Defendant ACDHS's investigation and its sham
psychological evaluation.

166.    C.Ci. never threatened or attempted to threaten the safety of any employee of
Defendant ACDHS, including Defendant Dossey.

167.    Despite this, Defendant Dossey had an Arapahoe County attorney move for a protection order against C.Ci. in an intentional effort to remove any ability C.Ci. had to advocate for custody of C.Ci.,'s stepson.

168.    As part of the basis for its removal, Defendant ACDHS falsely indicated in investigatory documents that C.Ci. gave her stepson a black eye when C.Ci., in fact, never abused her stepson.

169.    In a desperate attempt to prove that she was not giving drugs to her stepson or her partner's son, C.Ci. also agreed to undergo drug testing, all of which came back negative.

170.    After permanently separating C.Ci. from her stepson, Defendant ACDHS placed C.Ci.'s stepson with his maternal grandmother outside the State of Colorado, in the State of Nevada, even though Defendant ACDHS had in its possession, at the time placement was made, medical documentation indicating that such placement was dangerous for C.Ci.'s stepson.

171.    Based upon the above allegations, Defendant ACDHS violated C.Ci.'s civil rights, right to due process, and right to equal protection.

172.    Defendant ACDHS's actions related to C.Ch. share common issues of both law and fact when compared with its actions related to every other member of the putative class including, including its unconstitutional separation of C.Ci. from her stepson.

**ALLEGATIONS OF PUTATIVE CLASS MEMBER M.C.**

173.    In May 2021, Defendant ACDHS unconstitutionally separated Putative Class Member M.C. from her children.

29

174.    Defendant ACDHS opened a dependency and neglect case about M.C. as a result of patently false allegations made by M.C.'s father.

175.    Law enforcement authorities never opened an investigation into M.C.'s alleged abuse or neglect of her children.

176.    No medical record exists which supports M.C.'s alleged abuse or neglect of her children.

177.    Defendant ACDHS failed to uncover any evidence of M.C.'s alleged abuse or neglect of her children.

178.    Despite M.C.'s father having abused M.C. when she was a child and having been notified by M.C. that the allegations against M.C. were false, Defendant ACDHS advocated that custody of her children be granted instead to M.C.'s father, who made the false allegations against M.C. and abused M.C. when she was a child.

179.    M.C. never met with a caseworker employed by Defendant ACDHS before Defendant ACDHS sought to permanently terminate her parental rights.

180.    Defendant ACDHS only provided M.C. with one days' notice – and such notice was not in writing – of a hearing at which M.C.'s parental rights were terminated.

181.    Based upon the above allegations, Defendant ACDHS violated M.C.'s civil rights, right to due process, and right to equal protection.

182.    Defendant ACDHS's actions related to M.C. share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of M.C. from her children.

## ALLEGATIONS OF PUTATIVE CLASS MEMBER W.C.

183.    In December 2020, Defendant ACDHS unconstitutionally separated Putative Class Member W.C. from his daughter.

184.    Defendant ACDHS opened an investigation into W.C. based upon a false allegation that he was an "extremely high danger" to his partner and children.

185.    During the course of the investigation, the child who initially made the allegations of abuse admitted to a caseworker employed by Defendant ACDHS that these allegations were false and were based upon prior experiences involving the child's mother and a former partner who was not W.C.

186.    In fact, the ACDHS caseworker assigned to investigate W.C. confirmed that she "did not observe any bruising on [W.C.'s partner's] face, neck or arms."

187.    W.C.'s partner repeatedly confirmed that W.C. never physically abused her or attempted to physically abuse her.

188.    W.C. also never physically abused his daughter nor was there any evidence of abuse.

189.    Nonetheless, as a result of its investigation and subsequent judicial proceedings, W.C. had his parental rights to his daughter terminated.

190.    Defendant ACDHS gave W.C. no opportunity to participate in the case or allow him to advocate for custody of his daughter.

191.    After terminating his parental rights, Defendant ACDHS instead gave custody of W.C.'s daughter to her biological mother and the mother's father (her grandfather).

31

192.     Defendant ACDHS gave custody of W.C.'s daughter to the girl's biological mother even though the mother was on active probation for driving under the influence with the daughter in the car and while the daughter was not wearing a seatbelt.

193.     Defendant ACDHS gave custody of W.C.'s daughter to the girl's grandfather even though the grandfather is a registered sex offender in the State of Colorado.

194.     Defendant ACDHS sought to separate and eventually was successful in separating W.C. from his daughter even though his daughter never made a single abuse allegation against W.C. nor exhibited any signs of abuse or neglect allegedly inflicted by W.C.

195.     In summary, Defendant ACDHS separated W.C.'s daughter from him based upon a single allegation made by another child which was later recanted and not supported by any other evidence – documented or otherwise – and gave custody of W.C.'s daughter to a convicted and registered sex offender.

196.     Based upon the above allegations, Defendant ACDHS violated W.C.'s civil rights, right to due process, and right to equal protection.

197.     Defendant ACDHS's actions related to W.C. share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of W.C. from his daughter.

## ALLEGATIONS OF PUTATIVE CLASS MEMBER D.G.

198.     In or about August 2008, Defendant ACDHS unconstitutionally separated Putative Class Member D.G. from her grandchild, who is also a registered member of a Native American tribe.

32

199.    As a grandmother, D.G. has a statutorily-protected right to obtain custody of her grandchildren in a dependency and neglect case involving a grandchild and was also a qualified foster parent who was more than willing and able to take custody of her granddaughter.

200.    As Defendant ACDHS's unconstitutional separation of D.G. from her granddaughter is ongoing as of the date of this filing, the child is still a minor as of the date of this filing, and Defendant ACDHS's conduct also involved the unlawful taking of a child who is a registered member of a Native American tribe, Defendant ACDHS's violation is an ongoing constitutional violation.

201.    Defendant ACDHS began investigating D.G.'s household after her son was falsely accused of assaulting his girlfriend, an allegation which the girlfriend later recanted in full while testifying under oath.

202.    Due *solely* to D.G.'s son's *pending* charges – which were later dismissed – Defendant ACDHS terminated all custodial rights of both D.G. and her son.

203.    A caseworker assigned to investigate D.G. and her son admitted that there was no evidence that D.G. or her son ever threatened, abused, or neglected the child.

204.    A caseworker of Defendant ACDHS's came to the hospital and removed D.G.'s granddaughter  almost immediately after D.G.'s son's girlfriend gave birth to the granddaughter.

205.    When these caseworkers, April See and Christina Abbott, both employed by Defendant ACDHS, showed up at the hospital, D.G. overheard them speaking in the hall

regarding what they should tell the Judge in order to ensure that the baby was permanently removed and adopted out because they knew of a couple that was looking for a part-Caucasian, part-Native American or part-Asian newborn.

206.    When the caseworker attempted to remove the newborn from the girlfriend's arms and the girlfriend refused, the caseworker forcibly removed the newborn from her own mother's arms and nearly caused the newborn to fall to the ground.

207.    Defendant ACDHS rejected all attempts D.G. made to take classes to become a foster parent to her granddaughter.

208.    D.G. expressly told Defendant ACDHS about her granddaughter's registered membership in the Navajo nation and provided her granddaughter's Native American census number to one of Defendant ACDHS's supervisors at the time, Stan Stevens.

209.    Mr. Stevens arranged for a single visit between D.G.'s son and his daughter (and D.G.'s granddaughter) but later physically assaulted D.G.'s son during this visit.

210.    Defendant ACDHS and the caseworkers assigned to D.G.'s case never contacted the Navajo nation to confirm D.G.'s granddaughter's membership.

211.    A caseworker assigned to D.G.'s case later falsely testified in open court that she had attempted to contact the Navajo nation to confirm the granddaughter's membership but did not receive responsive communication with the Navajo nation.

212.    When D.G. contacted the Navajo nation regarding this testimony, the Navajo nation advised that no one employed by or associated with Defendant ACDHS ever contacted the Navajo nation to confirm the granddaughter's census number or membership.

213.    Based upon the above allegations, Defendant ACDHS violated D.G.'s civil rights, right to due process, and right to equal protection.

214.    Defendant ACDHS's actions related to D.G. share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of D.G. from her granddaughter.

## ALLEGATIONS OF PUTATIVE CLASS MEMBER K.G.W.

215.    In or about February 2011, Defendant ACDHS unconstitutionally separated Putative Class Member K.G.W. from her three children.

216.    As Defendant ACDHS's unconstitutional separation of K.G.W. from her children is ongoing as of the date of this filing, and all three children are still minors, Defendant ACDHS's violation is an ongoing constitutional violation.

217.    K.G.W. was regularly physically abused by her husband.

218.    K.G.W. reported this physical abuse to law enforcement authorities.

219.    After reporting this physical abuse to law enforcement authorities, law enforcement officers and a social worker employed by Defendant ACDHS visited K.G.W.'s house.

220.    Defendant ACDHS took temporary custody of K.G.W.'s children under the false premise that such custody was for one night only.

221.    Subsequently, K.G.W. obtained a permanent restraining order against her husband.

222.   K.G.W.'s husband was so enraged by the permanent restraining order that he savagely beat K.G.W. after the court hearing and in full view of numerous law enforcement authorities, causing near-fatal injuries to K.G.W.

223.   As a result of the violent physical assault, K.G.W. was placed in a safe house.

224.   Unbeknownst to K.G.W., Defendant ACDHS used this opportunity to take permanent custody of her children and adopt them out to K.G.W.'s former stepfather and his new wife.

225.   The same caseworker who helped K.G.W. after the physical assault was later chiefly responsible for adopting out K.G.W.'s three children.

226.   Defendant ACDHS adopted out K.G.W.'s three children to her ex-stepfather even though the Colorado Department of Human Services previously investigated the ex-stepfather for inappropriately touching K.G.W. in a sexual manner when K.G.W. was 15.

227.   Defendant ACDHS provided no notice whatsoever of its investigation, plans to permanently remove the children, or eventual adoption out of the children.

228.   Defendant ACDHS removed K.G.W.'s three children from her care and adopted them out to K.G.W.'s former stepfather, who is located outside of the State of Colorado, in the State of New Mexico.

229.   Defendant ACDHS permanently removed K.G.W.'s children from her care and adopted them out even though all evidence indicated that K.G.W. was an excellent caretaker of her three children.

230.     To this day, K.G.W. has not received any communications from Defendant
ACDHS, including a phone call, informing her of the status or whereabouts of her three
children.

231.     Based upon the above allegations, Defendant ACDHS violated K.G.W.'s civil
rights, right to due process, and right to equal protection.

232.     Defendant ACDHS's actions related to K.G.W. share common issues of both
law and fact when compared with its actions related to every other member of the putative
class including its unconstitutional separation of K.G.W. from her three children.

## ALLEGATIONS OF PUTATIVE CLASS MEMBER B.G.

233.     On or about October 26, 2018, Defendant ACDHS unconstitutionally separated
Putative Class Member B.G. from her children.

234.     As Defendant ACDHS's unconstitutional separation of B.G. from her children
is ongoing as of the date of this filing and the children are still minors, Defendant ACDHS's
violation is an ongoing constitutional violation.

235.     Defendant ACDHS initially began investigating B.G. based upon allegations
that B.G.'s estranged husband was sexually molesting one of their children.

236.     Defendant ACDHS assigned Defendant Niceta to investigate B.G.

237.     Defendant Niceta repeatedly and falsely wrote in investigatory documents that
B.G. knew of the molestation and failed to report it to law enforcement authorities.

238.     There is no evidence whatsoever to support this false allegation outside of
Defendant Niceta's false allegations.

239.    When B.G.'s children attempted to advise Defendant Niceta that B.G. knew nothing of her ex-husband's acts, Defendant Niceta refused to take their statements and in turn advised them that if they spoke out in support of B.G., their mother, Defendant Niceta would ensure that they were permanently removed from B.G.'s custody and care.

240.    Even after B.G.'s estranged husband was removed from the residence and is now incarcerated, Defendant ACDHS and Defendant Niceta continued to investigate.

241.    Defendant Niceta forced B.G.'s children to meet with Defendant Niceta alone and such meetings were not recorded.

242.    Defendant Niceta later falsified the statements that she eventually took of B.G.'s children and falsely testified, in open court, that B.G.'s children told Defendant Niceta that B.G. knew of and failed to report the acts of her estranged husband.

243.    Defendant Niceta also coerced B.G.'s daughter to write a false written statement against B.G.

244.    Defendant Niceta, working in concert with the guardian *ad litem*, falsely accused B.G. of having a second "secret" mobile phone which she used to communicate with her son.

245.    Defendant Niceta fabricated this allegation in order to discredit B.G. and make it appear as if B.G. was hiding information from her, Defendant ACDHS, and the Court.

246.    Defendant Niceta's last meeting with B.G. occurred with B.G. in B.G.'s residence; for the first time, Defendant Niceta insisted that she and B.G. meet privately on B.G.'s back patio as opposed to meeting with B.G. and her partner in the living room as Defendant Niceta had done for every other meeting.

38

247.    Defendant Niceta gave B.G. a list of items that needed to be accomplished within two weeks or else Defendant Niceta would permanently remove B.G.'s children from her custody and care.

248.    B.G. agreed to accomplish all of the requested items.

249.    Without any authorization or reason, Defendant Niceta called B.G.'s work supervisor and unnecessarily identified herself as a caseworker employed by Defendant ACDHS.

250.    However, that night, Defendant ACDHS later advised B.G. that an "anonymous call" had been made.

251.    As a result of this supposed "anonymous call," Defendant ACDHS picked up B.G.'s children from school the next day and demanded that B.G. pack their bags.

252.    Upon information and belief, Defendant Niceta herself made the anonymous call just as she had done in relation to Class Representative.

253.    Defendant ACDHS sent two of B.G.'s children outside the State of Colorado, to the State of Alaska.  A third was forced to remain in the custody and care of B.G.'s friend.

254.    B.G. has not lived with her children since Defendant ACDHS picked up B.G.'s children from their schools without any prior notice of the removal.

255.    Based upon the above allegations, Defendant ACDHS violated B.G.'s civil rights, right to due process, and right to equal protection.

256.    Defendant ACDHS's actions related to B.G. share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of B.G. from her three children.

## ALLEGATIONS OF PUTATIVE CLASS MEMBERS Ke.H. and Ka.H.

257.    In or about February 2020, Defendant ACDHS unconstitutionally separated Putative Class Member Ke.H. and Ka.H. from their granddaughter and daughter, respectively.

258.    Ke.H. is the mother of Ka.H.

259.    As a grandmother, Ke.H. has a statutorily-protected right to obtain custody of her grandchildren in a dependency and neglect case involving a grandchild.  In fact, Ke.H. had already obtained custody of the granddaughter's brother two years prior.

260.    At the time Defendant ACDHS removed her granddaughter from her custody and care, Ke.H. had been visiting with her granddaughter three to four times per week for the previous six months and her granddaughter had formed close bonds with both Ke.H. and other members of Ke.H.'s family.

261.    Defendant ACDHS initially became involved after Ke.H. reported that her granddaughter was being physically abused while in her father's care.

262.    Ke.H. intervened in her daughter's dependency and neglect case in order to obtain care and custody of her granddaughter.

263.    In the course of the case and its related investigation, Defendant ACDHS offered false testimony and false evidence.

264.    First, Defendant ACDHS's caseworkers materially altered statements Ke.H made to the caseworkers.

265.    These altered statements were offered as evidence in judicial proceedings.

266.     Second, Defendant ACDHS through its caseworker, Penelope Chiha, offered testimony and evidence which was directly contradictory to numerous police reports, which, for example, contained no evidence of dependency or neglect of Ke.H.'s and Ka.H.'s granddaughter and daughter, respectively.

267.     When Ke.H. attempted to have Defendant ACDHS remove Caseworker Chiha from this investigation due to her conflict of interest and involvement in a prior investigation, Defendant ACDHS failed to do so and Caseworker Chiha failed to recuse herself as well.

268.     Upon information and belief, Defendant ACDHS later re-assigned Caseworker Chiha from her role as a permanency caseworker because of her misconduct related to this investigation.

269.     Third, Defendant ACDHS also coerced Ke.H.'s daughter, Ka.H. into offering false testimony about her mother, Ke.H., by threatening Ka.H. that if she did not testify against her mother, Defendant ACDHS would permanently remove Ka.H.'s child.

270.     Fourth, Defendant ACDHS's caseworker, Penelope Chiha, knowingly offered testimony regarding how well the granddaughter's father – with whom the granddaughter had been placed – was doing both independently and in his care of the child even though the father was known to Defendant ACDHS to be an alcoholic who engages in domestic violence.

271.     Additionally, Defendant ACDHS and its caseworkers knowingly falsified information contained in domestic violence probation reports regarding the father of Ke.H.'s and Ka.H.'s granddaughter and daughter, respectively, which were submitted in order to help the father gain custody in place of Ke.H. and Ka.H.

41

272.     Defendant ACDHS knowingly failed to contact the father's parole officer for further information regarding the father's ability to care for Ke.H.'s and Ka.H.'s granddaughter and daughter, respectively.

273.     Even when Defendant ACDHS affirmatively gained information that the child's father had violated a protective order and was incarcerated, Defendant ACDHS failed to introduce this information in the dependency and neglect proceedings and failed to recommend that the child be returned to the custody and care of Ke.H. and Ka.H.

274.     Defendant ACDHS also moved for a protection order against Ke.H. without any justification, effectively preventing Ke.H. from advocating to maintain custody of her granddaughter.

275.     Defendant ACDHS forced Ke.H. to undergo a sham mental health evaluation in an intentional effort to create evidence discrediting Ke.H. and her caretaking ability even though Ke.H is a medical professional and did not have any mental health concerns.

276.     Defendant ACDHS intentionally failed to contact Ke.H.'s own medical care providers because this contact would have revealed that Ke.H. had no mental health issues which would have interfered with her ability to care for the child whatsoever.

277.     Defendant ACDHS removed Ke.H.'s granddaughter from her care even though Ke.H. had been repeatedly approved for parenting time in the years prior.

278.     Defendant ACDHS removed Ke.H.'s granddaughter from her care even though Ke.H. maintained custody of another child, her grandson, without any issues.

279.     Defendant ACDHS also knowingly failed to disclose critical information that the child remained in an abusive and injurious environment when placed in the child's father's

custody and care, including that the child was present for drug transactions, was not being provided appropriate medical care, was sleeping in a bed between the child's paternal grandmother and the grandmother's boyfriend, and other clear violations of the Safety Plan which Defendant ACDHS had implemented for the child's benefit and safety.

280.    Even when Ka.H. was released from incarceration and completed all actions requested by Defendant ACDHS in order to re-gain custody of her daughter and had received several documents stating that there were no concerns with her re-gaining care and custody of her child, Defendant ACDHS refused to return her daughter to Ka.H.

281.    Based upon the above allegations, Defendant ACDHS violated Ke.H.'s and Ka.H.'s civil rights, right to due process, and right to equal protection.

282.    Defendant ACDHS's actions related to Ke.H. and Ka.H. share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of Ke.H. and Ka.H. from their granddaughter and daughter, respectively.

**ALLEGATIONS OF PUTATIVE CLASS MEMBER S.H.**

283.    In or about July 2022, Defendant ACDHS unconstitutionally separated Putative Class Member S.H. from her newborn son.

284.    The basis for Defendant ACDHS's separation of S.H. from her newborn was that S.H. had *presumptively* tested positive for a controlled substance.

285.    However, this presumptive positive test result was purely the result of an error in reading the test results.

43

286.     Additionally, after this presumptive positive, S.H. repeatedly re-tested for all controlled substances and these tests repeatedly came back negative.

287.     Upon learning that S.H. was giving birth to her son, Defendant ACDHS's caseworker Amber Marie Taylor showed up to the hospital and demanded that S.H., S.H.'s umbilical cord, and the newborn baby be tested for controlled substances.

288.     All tests for controlled substances came back negative.

289.     Upon Caseworker Taylor's demand that the umbilical cord repeatedly be re-tested for controlled substances, the hospital refused this request as re-testing human tissue such as an umbilical cord was not practicable or possible.

290.     Defendant ACDHS also falsely premised its removal of S.H.'s newborn baby on the basis of the baby's father being present at the birth even though the father had a Court Order permitting him to attend the birth.

291.     Defendant ACDHS falsely premised its removal of S.H.'s newborn baby on the basis of S.H. and the baby having contact with the baby's father even though Court Orders permit the father to have such contact.

292.     Through bruising and sores all over his hand, nose, and head, it is likely that S.H.'s newborn son is being abused in his foster home.

293.     When S.H. received supervised parenting time with her newborn son, she changed his diaper and noticed that he had fecal matter stuck to his skin, indicating further evidence of abuse and neglect by the newborn's foster caretakers.

294.     When S.H. reported these allegations of abuse, Defendant ACDHS apparently conducted a summary investigation and "screened out" the baby's foster caretakers.

44

295.    Defendant ACDHS proceeded with the removal of S.H.'s newborn son even though Caseworker Taylor had previously testified in open court that S.H.'s home was suitable and safe for her newborn son.

296.    Later, in seeking to permanently separate S.H. from her son, a caseworker supervisor of Defendant ACDHS falsely testified that S.H.'s home was not safe even though she had never been to S.H.'s home.

297.    Defendant ACDHS proceeded with the removal of S.H.'s newborn son even though S.H. had successfully completed a Safety Plan, had maintained a track record of sobriety, and was engaged in extensive parenting classes and mental health treatment.

298.    Defendant ACDHS persuaded the hospital to discharge S.H. against her wishes and while her own newborn child was still in the Neo-Natal Intensive Care Unit (NICU).

299.    Even after giving birth, S.H. continued to test negative for all controlled substances.

300.    Defendant ACDHS' actions also caused S.H. to lose critical breast milk supply and injure herself when attempting to carry a car seat for the newborn to use to her newborn's foster caretakers.

301.    Based upon the above allegations, Defendant ACDHS violated S.H.'s civil rights, right to due process, and right to equal protection.

302.    Defendant ACDHS's actions related to S.H. share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of S.H. from her son.

## ALLEGATIONS OF PUTATIVE CLASS MEMBER J.L.P.

303.    In or about January 2022, Defendant ACDHS unconstitutionally separated Putative Class Member J.L.P. from her three children.

304.    Defendant ACDHS separated J.L.P. from her children because Defendant Niceta falsely testified in open court that J.L.P.'s older son sexually abused her daughter.

305.    Defendant Niceta also falsely testified that J.L.P. allowed her son to sexually abuse her daughter.

306.    The children's father had repeatedly made this false report regarding sexual abuse by J.L.P.'s son of her daughter and each time the claims have been investigated and the allegations have been conclusively deemed unfounded.

307.    In conducting an investigation of yet another round of false allegations made by the children's father, Defendant Niceta never spoke to J.L.P. to verify the veracity of the father's allegations.

308.    In conducting an investigation of yet another round of false allegations made by the children's father, Defendant Niceta never visited J.L.P.'s home to evaluate the environment.

309.    Despite this, Defendant Niceta falsely testified in open court that she had, in fact, visited J.L.P.'s home.

310.    Defendant Niceta never attempted a visit to J.L.P.'s home because J.L.P. carefully reviewed doorbell camera footage on the days Defendant Niceta claimed to have visited the home and the footage never showed Defendant Niceta visiting the residence.

46

311.   When J.L.P. attempted to communicate with Defendant Niceta by telephone, Defendant Niceta hung up on J.L.P.

312.   When J.L.P. attempted to communicate with Defendant Niceta by text message, Defendant Niceta refused to correspond with J.L.P. even though Defendant Niceta corresponded with the children's father by text message, sometimes late into the evening.

313.   Defendant ACDHS permanently removed J.L.P.'s children from her custody and care based solely on the false testimony and findings of Defendant Niceta.

314.   Defendant Niceta refused to meet with or otherwise communicate with J.L.P.'s mother regarding J.L.P.'s parenting ability.

315.   Defendant Niceta also refused to meet with or otherwise communicate with any other witness J.L.P. provided including J.L.P.'s former supervisor, J.L.P.'s other children, or J.L.P.'s current supervisor at the time of the investigation.

316.   When J.L.P. attempted to make a complaint regarding Defendant Niceta to Defendant Niceta's supervisor, another caseworker employed by Defendant ACDHS told J.L.P. that if she made a complaint, Defendant ACDHS would deem J.L.P. "noncompliant" with her treatment plan.

317.   Based upon the above allegations, Defendant ACDHS violated J.L.P.'s civil rights, right to due process, and right to equal protection.

318.   Defendant ACDHS's actions related to J.L.P. share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of J.L.P. from her children.

### ALLEGATIONS OF PUTATIVE CLASS MEMBER B.L.

47

319.    On or about June 1, 2021, Defendant ACDHS unconstitutionally and permanently separated Putative Class Member B.L. from her children.

320.    Defendant ACDHS partially removed B.L.'s children from her custody and care in 2017.

321.    Beginning in or about 2018, B.L. began successfully completing all aspects of Defendant ACDHS's treatment and parenting plan which included parenting classes. B.L. was subsequently allowed extensive unsupervised visits with her children, including entire summers in her home state of Arkansas.

322.    However, when her children arrived for a summer visit in 2019, B.L. immediately noticed that the children were not being cared for by their father, who had regular custody of the children outside of summers.

323.    One child had double pink eye.

324.    The two other children had viral infections and a high fever.

325.    All three children were malnourished and had dangerously low BMIs.

326.    When Arkansas DHS investigated, Arkansas DHS determined that it would be in the best interests of the children for the children to remain in the care and custody of their mother, B.L., in Arkansas.

327.    However, when Arkansas DHS contacted Defendant ACDHS to reach this agreement regarding the custody and care of the children, Defendant ACDHS refused to cooperate with Arkansas DHS.

328.    Accordingly, on or about June 28, 2019, B.L. was forced to send her children back to Colorado, to their father who was neglecting them.

329.    B.L.'s children again visited B.L. in May 2020.

330.    Immediately after beginning this visit, two of B.L.'s daughters reported to B.L. that they were being sexually molested by their paternal grandfather.

331.    When B.L. made this complaint to Defendant ACDHS and indicated that she was not going to return her children to the care and custody of a sexual abuser, Defendant ACDHS moved to put a warrant out for B.L.'s arrest.

332.    Upon investigating B.L.'s allegations, Defendant Niceta falsely testified that B.L.'s allegations were unfounded.

333.    Defendant Niceta, who was assigned to B.L.'s case, falsely testified that B.L.'s allegations were unfounded even though multiple medical records from Arkansas pediatric hospitals indicated that B.L.'s children were being neglected (and were, for example, malnourished, frequently had untreated urinary tract infections, and frequently not receiving medical treatment for constant sicknesses) and sexually molested by their caretakers in Colorado.

334.    Defendant Niceta, in addition to intentionally ignoring multiple medical records indicating this abuse and neglect, also intentionally ignored other evidence of abuse and neglect such as pictures of the children's pink eye as well as bed bugs in their beds in Colorado.

335.    Defendant Niceta knowingly and intentionally testified and recommended that B.L.'s children should remain with individuals shown to neglect and abuse, including sexually abuse, B.L.'s children

49

336.    Based upon the above allegations, Defendant ACDHS violated B.L.'s civil rights, right to due process, and right to equal protection.

337.    Defendant ACDHS's actions related to B.L. share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of B.L. from her children.

### ALLEGATIONS OF PUTATIVE CLASS MEMBER C.M.

338.    On or about September 16, 2021, Defendant ACDHS unconstitutionally separated Putative Class Member C.M. from her son.

339.    C.M. voluntarily sought Defendant ACDHS's assistance regarding her disabled teenage son.

340.    C.M.'s teenage son would frequently become violent with C.M. and cause significant property damage at her home.

341.    A Children's Hospital social worker that C.M. was working with regarding her son recommended that C.M. contact Defendant ACDHS for assistance.

342.    C.M. was hesitant to involve Defendant ACDHS but eventually agreed to seek Defendant ACDHS's assistance.

343.    Defendant Niceta was assigned to investigate and provide relief and assistance to C.M. and her son.

344.    Defendant Niceta began falsifying information related to Defendant ACDHS's investigation of C.M. and her son as early as her initial intake report.

50

345.    After another violent incident in which C.M.'s son injured C.M., C.M.'s son was committed to a psychiatric ward.

346.    Defendant Niceta mandated that C.M. receive unnecessary parenting coaching which included so-called "techniques" which would directly place C.M. in harm's way.

347.    Defendant Niceta's parenting advice to C.M. included advice which intentionally placed C.M. in danger of being harmed by her son and was only intended for young children and not teenagers, such as C.M.'s son.

348.    In the course of this permanency proceeding, Defendant Niceta falsely wrote in investigatory documents that C.M. left her son in dirty diapers for an entire weekend.

349.    When C.M. showed Defendant Niceta pictures of the physical damage C.M.'s son had caused to her house, Defendant Niceta instead falsely wrote in investigatory documents that C.M. was negligent in caring for her son and kept the house in unsanitary conditions.

350.    To be clear, although she did seek emergency residential care for him, C.M. never sought to have Defendant ACDHS *permanently* remove her son from her care and wants to retain parental rights over him.

351.    Instead, in the course of attempting to seek help from Defendant ACDHS, Defendant Niceta and Defendant ACDHS opened a dependency and neglect case regarding C.M. in which they were eventually successful in removing C.M.'s son from her custody and care.

352.    During judicial proceedings associated with this case, caseworkers employed by Defendant ACDHS falsely testified in open court that C.M. was not cooperative with learning parenting techniques for her son.

353.    During the pendency of the investigation, C.M. was forced to undergo limited, supervised visitations with her son while the child's father was given unsupervised visits despite a long history of drug and alcohol use.

354.    During the pendency of the investigation, Defendant ACDHS, without notice or reason, abruptly ended C.M.'s visitation rights to her son.

355.    Based upon the above allegations, Defendant ACDHS violated C.M.'s civil rights, right to due process, and right to equal protection.

356.    Defendant ACDHS's actions related to C.M. share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of C.M. from her son.

## ALLEGATIONS OF PUTATIVE CLASS MEMBER J.N.

357.    In or about February 2021 Defendant ACDHS unconstitutionally separated Putative Class Member J.N. from her son.

358.    J.N. is the current partner of Putative Class Member C.Ci. and has her own son who she cares for with C.Ci.  This son is in addition to C.Ci.'s stepson for whom C.Ci. and J.N. also provide care.

359.    After Defendant ACDHS became involved in investigating C.Ci. and her stepson, J.N.'s own son was inserted into this investigation.

360.    Defendant ACDHS did not notify J.N. that there was an open case against her specifically until after J.N. was informed that she could not be around her son without supervision.

361.    During this time, Defendant ACDHS, without any basis removed medical decision-making responsibility and authority from J.N regarding the child.

362.    Without ever disclosing the source of these allegations, Defendant ACDHS falsely accused C.Ci. of physically abusing J.N.'s son.

363.    No medical documentation or other witnesses ever substantiated Defendant's false allegations regarding C.Ci.'s alleged physical abuse of J.N.'s son.

364.    J.N.'s son's father expressly told Defendant ACDHS that C.Ci. never physically abused the child but Defendant ACDHS intentionally ignored his statement.

365.    Defendant ACDHS also falsely accused J.N. of giving drugs to both her son and C.Ci.'s stepson.

366.    Again, no medical documentation or other witnesses ever substantiated Defendant's false allegations regarding C.Ci.'s alleged physical abuse or drugging of J.N.'s son.

367.    In fact, when C.Ci. and J.N. even agreed to have their sons drug-tested, the tests came back negative.

368.    Despite this complete lack of evidence, Defendant ACDHS and the caseworker assigned to the matter, Lynley Stevenson, sought to remove J.N.'s son from her custody – and was eventually successful in obtaining this removal – simply because J.N. maintained a relationship with C.Ci.

53

369.    Caseworker Stevenson and Defendant ACDHS then sought to have a protection order entered against both J.N. and C.Ci., effectively prohibiting them from having any contact with J.N.'s son.

370.    Defendant ACDHS never provided a copy of the protection order to J.N.

371.    After repeated home visits, all of which revealed that J.N.'s home was safe for her son, the dependency and neglect case against J.N. was dismissed.

372.    Based upon the above allegations, Defendant ACDHS violated J.N.'s civil rights, right to due process, and right to equal protection.

373.    Defendant ACDHS's actions related to J.N. share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of J.N. from her son.

## ALLEGATIONS OF PUTATIVE CLASS MEMBER K.N.

374.    Beginning in or about January 2021 employees of Defendant ACDHS, working in their official capacities, including Defendant Niceta, intentionally interfered with another county DHS's investigation in an effort to unconstitutionally separate Putative Class Member K.N. from her daughter.

375.     K.N. is a former partner of Defendant Niceta.

376.    Defendant Niceta, in her official capacity as a caseworker employed by Defendant ACDHS, made numerous false complaints about K.N. regarding domestic violence.

377.    Defendant Niceta used her position as a caseworker employed by Defendant ACDHS to bolster the credibility of her false accusations.

378.    However, when law enforcement authorities investigated, they never found any evidence that K.N. was domestically abusing Defendant Niceta.

379.    Despite this, Defendant ACDHS opened an investigation and referred it to another county, Adams County, for subsequent investigation.

380.    Despite the referral to Adams County, Defendant ACDHS, through its employees working in their official capacities, intentionally interfered with the Adams County investigation and judicial proceedings.

381.    During the Adams County judicial proceedings, Defendant Niceta not only introduced herself and testified in her capacity as a caseworker employed by Defendant ACDHS but was also qualified and admitted as an expert witness as a result of her employment with Defendant ACDHS.

382.    During her testimony, which was completed in her official capacity and as an expert witness due to her employment with Defendant ACDHS, Defendant Niceta made numerous false allegations that K.N. was abusing K.N.'s daughter or was otherwise an unfit parent.

383.    Defendant Niceta also used her official governmental email associated with Defendant ACDHS to correspond with Adams County during its investigation and subsequent judicial proceedings.

384.    Another caseworker employed by Defendant ACDHS knew of domestic violence issues between Defendant Niceta and her then-partner and failed to report this to Adams County despite having a mandatory duty to do so in her official capacity as a

55

caseworker and knowing that Adams County was considering the placement of K.N.'s daughter, which it eventually assigned to Defendant Niceta.

385.    Defendant Niceta, in her official capacity as a caseworker employed by Defendant ACDHS, also falsely accused K.N. of threatening Defendant Niceta, including that she made a death threat, in an effort to discredit K.N. and separate her from her daughter during the ongoing Adams County investigation.

386.    Defendant Niceta, in her official capacity as a caseworker employed by Defendant ACDHS, also falsely accused K.N. of not meeting her eight-hour parenting time requirements during the ongoing Adams County investigation.

387.    Based upon the above allegations, Defendant Niceta and at least one other caseworker employed by Defendant ACDHS violated, in their official capacities as employees of Defendant ACDHS, K.N.'s civil rights, right to due process, and right to equal protection.

388.    These actions, including the conduct of Defendant Niceta in her official capacity as a caseworker employed by Defendant ACDHS, related to K.N. shares common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of K.N. from her daughter.

## ALLEGATIONS OF PUTATIVE CLASS MEMBER B.S.

389.    In or about February 2022, Defendant ACDHS unconstitutionally separated Putative Class Member B.S. from her four children.

390.    Defendant ACDHS initially began investigating B.S. based upon false allegations of child abuse.

391.    In fact, as soon as law enforcement authorities reported to B.S.'s residence, the reporter of the allegations immediately admitted that they were false.

392.    Nevertheless, Defendant ACDHS opened an investigation into the recanted allegations.

393.    Defendant Niceta was assigned to investigate B.S.

394.    During the course of her investigation, Defendant Niceta selectively took statements from numerous parties without taking statements from other parties that should have been interviewed.

395.    Defendant Niceta fabricated a statement made by B.S.'s mother and later falsely testified regarding this altered statement in open court.

396.    In fact, Defendant Niceta never even met with or spoke to B.S.'s mother.

397.    As a result of Defendant Niceta's actions and false testimony, B.S.'s children were removed from her custody and care.

398.    As a result of Defendant Niceta's actions and false testimony B.S.'s children were placed in different homes and are no longer living together in one residence. as they were prior to Defendant ACDHS unconstitutionally removing them from B.S.'s custody and care. The children's living separate living arrangements were a direct result of Defendant Niceta's falsification of evidence and false testimony.

399.    Based upon the above allegations, Defendant ACDHS violated B.S.'s civil rights, right to due process, and right to equal protection.

400.    Defendant ACDHS's actions related to B.S. share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of B.S. from her four children.

## ALLEGATIONS OF PUTATIVE CLASS MEMBERS J.S. AND K.S.

401.    In or about September 2019, Defendant ACDHS unconstitutionally separated Putative Class Members J.S. and K.S. from their children and grandchildren, respectively.

402.    K.S. is the mother of J.S.

403.    K.S. has an extensive history of serving as a successful foster parent.

404.    As Defendant ACDHS's unconstitutional separation of J.S. and K.S. from their children and grandchildren is ongoing as of the date of this filing, and children are still minors, Defendant ACDHS's violation is an ongoing constitutional violation.

405.    As a grandmother, D.G. has a statutorily-protected right to obtain custody of her grandchildren in a dependency and neglect case involving a grandchild.

406.    Defendant ACDHS initially began investigating J.S. based upon patently false allegations made by J.S.'s ex-spouse that J.S. was physically abusing the ex-spouse.

407.    J.S.'s ex-spouse has a long history of making false allegations – all of which have later been disproven – against J.S. and has made over three dozen false reports against him.

408.    In fact, in order to escape J.S.'s ex-spouse's harassment. J.S, K.S., and the children found it necessary to relocate from Jefferson County to Arapahoe County.

409.    J.S. was either found not guilty regarding the allegations or law enforcement determined that the allegations were unfounded and did not even open an investigation.

58

410.     Despite this long history of provably false allegations, Defendant ACDHS and the caseworker assigned to investigate J.S. and K.S., Katrina Mortimer, removed the children from the custody and care of J.S. and K.S.

411.     J.S. and K.S. were, in fact, eating lunch with the children when Defendant ACDHS and law enforcement forcibly removed the children.

412.     Defendant ACDHS removed the children without any evidence of abuse or neglect committed by J.S. or K.S.

413.     Defendant ACDHS removed the children based solely on the provably false allegations of J.S.'s ex-spouse.

414.     Defendant ACDHS placed the children in the custody and care of the ex-spouse, who was living in a motel at that time.

415.     Defendant ACDHS removed the children and placed them in a motel even though J.S. and K.S. maintained a safe and appropriate residence for the children in Arapahoe County.

416.     Defendant ACDHS placed the children with J.S.'s ex-spouse even though she had physically assaulted J.S. in the past and was committed for psychiatric holds for other incidents.

417.     Defendant ACDHS placed the children with J.S.'s ex-spouse and, in this placement, allowed the children to be in the presence of the ex-spouse's father even though the ex-spouse has claimed that her father raped her when she was a child.

418.     Defendant ACDHS also moved for the Court to enter an unconstitutional gag order so that neither J.S. nor K.S. could protest the removal of their children and grandchildren, respectively.

419.     After K.S. wrote a generic Facebook post based upon her experience caring for other children as a foster parent, Defendant ACDHS moved to jail K.S. for the post.  K.S. was, in fact, jailed for four days.

420.     Defendant ACDHS also changed the children's last names and re-scheduled court dates at the last minute, just prior to their occurrence, to prevent J.S. and K.S. from attending the judicial proceedings.

421.     Based upon the above allegations, Defendant ACDHS violated J.S.'s and K.S.'s civil rights, right to due process, and right to equal protection.

422.     Defendant ACDHS's actions related to J.S. and K.S. share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of J.S. and K.S. from their children and grandchildren, respectively.

### **ALLEGATIONS OF PUTATIVE CLASS MEMBER Ja.S.**

423.     In or about 2018, Defendant ACDHS unconstitutionally separated Putative Class Member Ja.S. from her son.

424.     As Defendant ACDHS's unconstitutional separation of Ja.S. from her son is ongoing as of the date of this filing, Defendant ACDHS's violation is an ongoing constitutional violation.

425.    Defendant ACDHS initially began investigating Ja.S. based solely on acts committed by her son.

426.    Defendant ACDHS assigned Defendant Niceta to investigate Ja.S.

427.    During the course of the investigation, Defendant Niceta removed Ja.S.'s son and placed him at the Shiloh House.

428.    While the investigation was pending, Defendant Niceta gave her personal home phone number and personal home address to Ja.S.

429.    While the investigation was pending, Defendant Niceta invited Ja.S. to her personal residence in order to purportedly meet with Ja.S. about the investigation and her son's treatment at the Shiloh House.

430.    Defendant Niceta invited Ja.S. to her personal residence under the false pretense that Defendant Niceta had gift cards to give to Ja.S. to purchase gas in order to visit her son at Shiloh House as well as buy items such as snacks to give to her son at Shiloh House.

431.    When Ja.S. entered Defendant Niceta's personal residence, Defendant Niceta asked her to sit and relax.

432.    Defendant Niceta offered Ja.S. an alcoholic beverage.

433.    Defendant Niceta made it clear that she was trying to initiate a sexual relationship with Ja.S.

434.    When Ja.S. declined both the alcoholic beverage and Defendant Niceta's sexual advances, Defendant Niceta took steps to ensure that Ja.S.'s son would be removed from her care and instead be placed in the custody and care of the son's father.

435.   Specifically, Defendant Niceta coerced Ja.S. into voluntarily terminating her parental rights over her son and granting full custody of the son to the child's father, who had been out of the child's life since he was five years old, as a result of threats of what Defendant Niceta would do if Ja.S. did not terminate her parental rights.

436.   Defendant ACDHS also began garnishing the son's father's payments of back child support to Ja.S. in order to pay for the services Ja.S.'s son received from the State of Colorado.

437.   Based upon the above allegations, Defendant ACDHS violated Ja.S.'s civil rights, right to due process, and right to equal protection.

438.   Defendant ACDHS's and Defendant Niceta's actions related to Ja.S.'s share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of Ja.S. from her son.

## ALLEGATIONS OF PUTATIVE CLASS MEMBER W.S.

439.   In or about March 2022, Defendant ACDHS unconstitutionally separated Putative Class Member W.S. from her son.

440.   Defendant ACDHS has changed its position numerous times on why an investigation was initially opened and why it subsequently requested a Verbal Removal Order.

441.   On March 30, 2022, Defendant ACDHS falsely accused W.S. of being under the influence of drugs and "beside herself" when, in fact, W.S. was sober.

442.   Despite this allegation, W.S. just six days later, on April 5, 2022, voluntarily had herself drug tested, which came back negative. The results of the drug test were provided to Defendant ACDHS.

443.    Defendant ACDHS intentionally ignored the negative drug test results.

444.    Defendant ACDHS assigned at least four caseworkers to investigate W.S., including Jenna Mukai and Roxanne Tademy.

445.    A caseworker employed by Defendant ACDHS altered records in the Trails system by removing all entries and documents within a certain time frame.

446.    A caseworker employed by Defendant ACDHS altered W.S.'s son's uncle's name to W.S.'s son's name.

447.    A caseworker employed by Defendant ACDHS intentionally falsified records related to W.S.'s son, including in stating that law enforcement had given him a citation relating to an incident in which W.S.'s son had allegedly been involved when the son had, in fact, not been issued a citation. This was done in an effort to discredit W.S. and her parenting ability.

448.    In an intentional effort to withhold information from W.S., a supervisor at Defendant ACDHS hung up on W.S. during a call with W.S. but later falsely indicated that W.S. was screaming at her, necessitating the supervisor to hang up. W.S. was not screaming or otherwise being aggressive with the supervisor at any time during the call.

449.    Defendant ACDHS and its employees also interfered with W.S.'s right to attend judicial proceedings by withholding a link to a virtual court appearance on at least one occasion.

450.    Defendant ACDHS did not conduct a home visit until May 3, 2022 – a month after removing her son.

451.    Caseworker Mukai also falsely accused W.S. of being under the influence of drugs and having drug or drug-making paraphernalia in her home when neither was true.

452.    Defendant ACDHS falsely accused W.S. of making methamphetamine in her home solely based upon the presence of cleaning materials, batteries, dog food, and cat food – none of which have anything to do with the manufacturing of drugs, including methamphetamine.

453.    Defendant ACDHS falsely stated in an investigatory report that it called local law enforcement authorities regarding the presence of these items when in fact, it never called law enforcement authorities regarding this issue.

454.    To be clear, no law enforcement authority ever found any evidence of the presence of drug-making materials in W.S.'s home.

455.    Defendant ACDHS also falsely accused W.S. of "non-linear thinking" as grounds to remove W.S.'s son.

456.    Defendant ACDHS and the caseworkers it assigned do not have the credentials to diagnose individuals such as W.S. with mental health diagnoses, "non-linear" is not a mental health diagnosis," and even if it was, "non-linear thinking" is not a proper basis upon which to separate a parent from their child.

457.    Defendant Dossey falsely stated that W.S. was uncooperative and provided no information regarding potential placement options for her son – which eventually resulted in him being placed in foster care – when W.S. had, in fact, provided numerous safe and appropriate placement options, including with family members.

458.     When Defendant ACDHS removed her son from her care and custody, it eventually placed her son with the boy's father, even though W.S. had previously reported him for kidnapping W.S.'s son.

459.     A caseworker employed by Defendant ACDHS falsely testified that W.S.'s son did not speak in her presence as a reason to remove W.S.'s son from her custody and care when in fact her son does speak in W.S.'s presence.

460.     Based upon the above allegations, Defendant ACDHS violated W.S.'s civil rights, right to due process, and right to equal protection.

461.     Defendant ACDHS's actions related to W.S.'s share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of W.S. from her son.

## ALLEGATIONS OF PUTATIVE CLASS MEMBER L.T.

462.     In or about December 2021, Defendant ACDHS unconstitutionally separated L.T. from her grandchild.

463.     As a grandmother, L.T. has a statutorily-protected right to obtain custody of her grandchildren in a dependency and neglect case involving a grandchild.

464.     Due to her daughter's drug abuse, L.T. voluntarily called Defendant ACDHS to express her concerns with her daughter's ongoing care of her infant child and L.T.'s grandchild.

465.     L.T. offered to care for the grandchild if her daughter could not.

466.     In retaliation for making this complaint to Defendant ACDHS, L.T.'s daughter made a patently false allegation against L.T. to Defendant ACDHS intended to discredit L.T.'s ability to take care of her granddaughter.

467.     Without doing any investigation whatsoever in the veracity of the allegations, Defendant ACDHS forced L.T. to take a surprise urinalysis but provided no notice of the urinalysis on a date and time which L.T. could not attend due to a work obligation.

468.     When L.T. was eventually able to take a urinalysis, Defendant ACDHS refused to give custody of the child to L.T. even when the urinalysis came back negative.

469.     In the petition, Defendant ACDHS pled that L.T. was unfit to take care of granddaughter based solely on L.T.'s daughter's false allegations without, as stated above, conducting any inquiry as to whether these allegations were false.

470.     Defendant ACDHS pled as much without conducting any required inquiry into the fitness or non-fitness of a familial placement option such as L.T.

471.     L.T. advised Defendant ACDHS and the caseworker assigned to her investigation, Jill Sorenson, that her daughter's allegations were not truthful and clearly retaliatory because L.T. reported her daughter to Defendant ACDHS, but Defendant ACDHS ignored these complaints.

472.     Defendant ACDHS failed to refer L.T.'s allegations regarding a false report to a governmental agency to the appropriate law enforcement authorities.

473.     As a result of its failure to investigate, Defendant ACDHS placed her grandchild in foster care instead of with the grandchild's family, which would have included L.T.

474.     Defendant ACDHS did so even though L.T. maintained custody over two of her other grandchildren and allowed L.T. to maintain custody over the grandchild for one night before summarily removing the child without any change in circumstances the next night.

475.     Defendant ACDHS also falsely alleged that L.T. did not comply with the Safety Plan it had implemented.

476.     Based upon the above allegations, Defendant ACDHS violated L.T.'s civil rights, right to due process, and right to equal protection.

477.     Defendant ACDHS's actions related to L.T.'s share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation from L.T. from her granddaughter.

## ALLEGATIONS OF CLASS MEMBER T.T.

478.     In or about August 2018, Defendant ACDHS unconstitutionally separated Putative Class Member T.T. from her children.

479.     As Defendant ACDHS's unconstitutional separation of T.T. from her children is ongoing as of the date of this filing and the children are still minors, Defendant ACDHS's violation is an ongoing constitutional violation.

480.     The only reason Defendant ACDHS began investigating T.T. is because she reported an act of sexual abuse she witnessed on another child not her own.

481.     Instead of investigating the complaint T.T. brought to its attention, Defendant ACDHS falsified a report that T.T.'s husband was, in fact, sexually abusing his and T.T.'s children.

482.    T.T.'s husband repeatedly told Defendant ACDHS and the caseworker assigned to their case that he did not commit the acts for which he was falsely accused.

483.    Defendant ACDHS's false allegations regarding her husband were the sole reason T.T.'s children were separated from her.

484.    Defendant ACDHS's false allegations regarding her husband led to her husband's incarceration.

485.    Even after her husband was wrongfully incarcerated for alleged incidents involving his children, Defendant ACDHS refused to allow the children to be returned to T.T.'s custody and care.

486.    Defendant ACDHS refused to release any documents related to its investigation or the reasons for removing T.T.'s children from her custody and care.

487.    Based upon the above allegations, Defendant ACDHS violated T.T.'s civil rights, right to due process, and right to equal protection.

488.    Defendant ACDHS's related to T.T.'s share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of T.T. from her children.

## ALLEGATIONS OF PUTATIVE CLASS MEMBER J.W.

489.    In or about 2019, Defendant ACDHS unconstitutionally separated Putative Class Member J.W. from her three children.

490.    To this day, J.W. is still unsure as to why Defendant ACDHS opened an investigation and immediately removed her children from her custody and control other than

that her ex-fiancée made a call to Defendant ACDHS; however, J.W. does not even know what the underlying allegations are.

491.    When Defendant ACDHS and its caseworker assigned to J.W.'s case, Elaine Castillo, initially came to remove J.W.'s kids, they refused to provide any documentation of why the removal was happening.

492.    Throughout the course of its investigation, Defendant ACDHS repeatedly made outlandish claims about J.W. in order to discredit her and permanently remove her children.

493.    Defendant ACDHS falsely claimed that J.W. threatened to blow up a building with her daughter inside of it while J.W. was leaving a parenting location with her daughter.

494.    J.W. never threatened to blow up a building.

495.    Defendant ACDHS falsely claimed that J.W. refused to take a drug test involving a hair follicle when she had given the testing facility a hair follicle.

496.    Although J.W. was given temporary parenting time and visited her children, Defendant ACDHS falsely alleged that J.W. was not, in fact, visiting her children in an effort to discredit her.

497.    On one occasion, Defendant ACDHS falsely alleged that J.W. was emotionally abusing her children. The Court disagreed with this assertion and found that there was no evidence to support it.

498.    Defendant ACDHS forced J.W. to complete an extensive treatment plan but, upon successfully completing of the plan by J.W., Defendant ACDHS still refused to return J.W. children to her.

499.    Defendant ACDHS, instead, only allowed J.W. to visit her children in a highly monitored, restrictive setting designed to prevent meaningful time between J.W. and her children.

500.    Defendant ACDHS also moved to enter an unconstitutional gag order which prevents J.W. from speaking about her case publicly or on social media.

501.    Defendant ACDHS's conduct so deeply traumatized J.W. that on at least three occasions, J.W. attempted to commit suicide.

502.    Based upon the above allegations, Defendant ACDHS violated J.W.'s civil rights, right to due process, and right to equal protection.

503.    Defendant ACDHS's actions related to J.W.'s share common issues of both law and fact when compared with its actions related to every other member of the putative class including its unconstitutional separation of J.W. from her children.

## C.R.C.P. 23 CLASS ALLEGATIONS

504.    Plaintiff alleges all claims as a C.R.C.P. 23 class action on her own behalf and on behalf of all similarly situated individuals for which she seeks certification.

505.    Pending any modifications necessitated by discovery, Plaintiff preliminarily defines the "C.R.C.P. 23 Class" as follows:

ALL CHILDREN, PARENTS, AND CARETAKERS WHO HAVE HAD THEIR

CONSTITUTIONAL RIGHTS VIOLATED IN THE COURSE OF AN ARAPAHOE

COUNTY DEPARTMENT OF HUMAN SERVICES, DIVISION OF CHILD AND ADULT

PROTECTION SERVICES, INVESTIGATION

506.     The class is so numerous that joinder of all potential class members is impracticable.  The exact size of the class will become more ascertainable as more individuals in the proposed class come forward and discovery is conducted.

507.     There are questions of law or fact common to the classes that predominate over any individual issues that might exist. Common questions of law and fact include Defendants' failure to abide by constitutional requirements in their investigations and Defendants' unlawful and/or unconstitutional separation of or attempts to separate children from their parents or caretakers.

508.     The class claims asserted by Plaintiff are typical of the claims of all the potential class members because she experienced nearly identical conduct when compared to other members of the class, including being investigated based on false allegations, having no action taken by Defendants after she complained that the underlying allegations were false, and being subject to Defendants' unconstitutional attempts to separate her from her child. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy. This is especially true in the case of the numerous individuals with whom the undersigned has conferred who either cannot afford individual legal representation or do not have the expertise to realistically navigate the legal system *pro se*.

509.     Plaintiff will fairly and adequately protect and represent the interests of the class. Her experiences with Defendants are similar to those of other members of the proposed class.

510.     Plaintiff is represented by counsel experienced in plaintiffs' litigation. Plaintiff's counsel has experience litigating in the United District Court for the District of Colorado and formerly practiced as a Civil Rights and Employment Assistant Attorney General with the Colorado Department of Law.

511.     The prosecution of separate actions by the individual potential class members would create a risk of inconsistent or varying adjudications with respect to individual potential class members that would establish incompatible standards of conduct for Defendants.

512.     The interest of potential class members in individually controlling the prosecution or defense of separate actions is slight. In addition, public policy supports the broad remedial purposes of class actions in general and that the pertinent federal and state laws are appropriate vehicles to vindicate the rights of individuals who are similarly situated as part of the larger class.

513.     Plaintiff is unaware of any members of the putative class who are interested in presenting their claims in a separate action.

514.     Plaintiff is aware of only one additional member of the putative class who has pursued pending litigation in a separate action concerning the instant controversy, as alleged in *Leghouini* et al. *v. Arapahoe County Department of Human Services* et al*.,* 1:22-cv-02066-STV (D. Colo Aug. 14, 2022).  Although Plaintiff has filed a separate action regarding her own experience with being investigated by Defendant ACDHS, that action is strictly limited to Defendant Niceta's false reporting of Plaintiff's alleged conduct to Defendant ACDHS, alleges

claims in tort for defamation and intentional infliction of emotional distress, and does not involve the same scope of conduct at issue in this action.

515.    It is desirable to concentrate this litigation in this forum because all parties are domiciled in this jurisdiction.

516.    This class action will not be difficult to manage due to the uniformity of claims among the class members and the use of representative testimony and representative documentary evidence.

## FIRST CLAIM FOR RELIEF

### Deprivation of Procedural Due Process – All Defendants

517.    Plaintiff incorporates herein by reference all of the allegations contained in the preceding and foregoing paragraphs of this pleading.

518.    The Fourteenth Amendment to the United States Constitution prohibits state actors such as Defendants from depriving an individual of liberty without due process of law.

519.    Included within this protection are the rights to a full, fair, and adequate investigation when state actors deprive or attempt to deprive an individual of fundamental liberty interests, including their right to raise, be part of, and maintain a family.

520.    Members of the class, including Plaintiff, have fundamental liberty interests in raising, being a part of, and maintaining a family.

521.    Defendants have violated the class and Plaintiff's federal due process rights when they

- repeatedly failed to conduct adequate, thorough, and constitutional investigations of child abuse and neglect complaints, which deprive parents and caretakers of their rights of due process and equal protection under the law;

- intentionally and knowingly failed to consider the testimony of individuals who would be intimately familiar with a subject child's wellbeing including relatives, teachers, friends, or other close associates;

- introduced false testimony at judicial proceedings regarding the separation or attempts to separate children from their parents or caregivers;

- intentionally or recklessly ignored express, written allegations regarding the falsity of a child abuse and neglect complaint;

- intentionally and knowingly failed to report allegations regarding the falsity of a child abuse and neglect complaint to law enforcement authorities;

- knowingly and intentionally altered statements and translations of statements of critical witnesses such as parents, caretakers, and their relatives, friends, colleagues, or other associates during the course of investigatory or judicial proceedings;

- knowingly and intentionally retained purported, out-of-state experts for the sole purpose of separating or attempting to separate children from their parents and caretakers;

- knowingly and intentionally ignored the findings and conclusions of other experts, including medical experts, who expressly and in writing disagreed with Defendant ACDHS' recommendations and conclusions;

- knowingly and intentionally modified internal open investigations in the TRAILS system in order to separate or attempt to separate children from their parents or caretakers;

- silenced, attempted to silence, and/or internally conspired to silence, through improper gag and restraining orders, or otherwise refused to hear, in the course of investigatory proceedings, individuals who protest or otherwise fight against the separation or attempted separation of children from their parents or caregivers.

522. Plaintiff and all other similarly situated individuals have been damaged by Defendants' procedural due process violations.

## SECOND CLAIM FOR RELIEF

### Deprivation of Substantive Due Process – All Defendants

523. Plaintiff incorporates herein by reference all of the allegations contained in the preceding and foregoing paragraphs of this pleading.

524. The Fourteenth Amendment to the United States Constitution protects fundamental liberty interests against certain governmental intrusions irrespective of the fairness of the procedures utilized. This substantive guarantee is intended to prevent state actors from employing their power in an abusive or oppressive manner.

525. Defendants conduct violates substantive due process by severely interfering with children's, parents', and caretakers' rights to raise, be a part of, and maintain a family, which are fundamental rights protected by the United States Constitution.

526.    But for Defendants' conduct, children, parents, and caretakers would be able to raise, be a part of, and maintain their families, which are fundamental rights protected by the United States Constitution.

527.    Plaintiff and all other similarly situated individuals have been unable to raise, be a part of, and maintain their families as a result of Defendants' substantive due process violations.

528.    Defendants' action in separating or attempting to separate families, based upon the allegations stated above and which include false testimony, falsification of evidence or investigatory documents, shock the conscience.

529.    Plaintiff and all other similarly situated have been damaged by Defendants' substantive due process violations.

## THIRD CLAIM FOR RELIEF

### Violation of 42 U.S.C. § 1983 – All Defendants

530.    Plaintiff incorporates herein by reference all of the allegations contained in the preceding and foregoing paragraphs of this pleading.

531.    At all times relevant to this action, Defendant ACDHS and its employees, including Defendant Niceta and Defendant Dossey, were acting under color of state law.

532.    Defendant ACDHS and its employees, including Defendant Niceta and Defendant Dossey, unlawfully deprived Plaintiff and all other similarly situated individuals of their civil rights when they unconstitutionally deprived Plaintiff and all other similarly situated individuals of their rights to substantive and procedural due process and equal protection under the law.

533.     Defendant ACDHS and its employees, including Defendant Niceta and Defendant Dossey, acted pursuant to widespread practices or customs of Defendant ACDHS which deprived Plaintiff and all other similarly situated individuals of their civil rights, including when Defendant ACDHS and its employees

- repeatedly failed to conduct adequate, thorough, and constitutional investigations of child abuse and neglect complaints, which deprive parents and caretakers of their rights of due process and equal protection under the law;

- intentionally and knowingly failed to consider the testimony of individuals who would be intimately familiar with a subject child's wellbeing including relatives, teachers, friends, or other close associates;

- introduced false testimony at judicial proceedings regarding the separation or attempts to separate children from their parents or caregivers;

- intentionally or recklessly ignored express, written allegations regarding the falsity of a child abuse and neglect complaint;

- intentionally and knowingly failed to report allegations regarding the falsity of a child abuse and neglect complaint to law enforcement authorities;

- knowingly and intentionally altered statements and translations of statements of critical witnesses such as parents, caretakers, and their relatives, friends, colleagues, or other associates during the course of investigatory or judicial proceedings;

- knowingly and intentionally retained purported, out-of-state experts for the sole purpose of separating or attempting to separate children from their parents and caretakers;

- knowingly and intentionally ignored the findings and conclusions of other experts, including medical experts, who expressly and in writing disagreed with Defendant ACDHS' recommendations and conclusions;

- knowingly and intentionally modified internal open investigations in the Trails system in order to separate or attempt to separate children from their parents or caretakers;

- silenced, attempted to silence, and/or internally conspired to silence, through improper gag and restraining orders, or otherwise refused to hear, in the course of investigatory proceedings, individuals who protest or otherwise fight against the separation or attempted separation of children from their parents or caregivers;

- investigated complaints which Defendants knew to be false;

- failed to refer allegations of false Complaints to the appropriate law enforcement authorities; and

- failed to adequately hire, train, supervise, and retain employees involved in the separation or attempts to separate children from the parents or caretakers; and

- failed to adopt clear policies to ensure that individuals such as Plaintiffs did not have their civil rights violated including, but not limited to, policies related to handling and investigating anonymous complaints, policies related to referring

allegations of false complaints to appropriate law enforcement authorities, policies of not removing children and placing them in the care and custody of both alleged and convicted child abusers, and policies for ensuring that children temporarily removed were returned to their parents or caretakers after an investigation revealed no reason to permanently remove the children.

534.    Defendants also, pursuant to a widespread practice or custom, conspired with purported medical experts they retained to create reports containing false and unfounded medical diagnoses and other underlying false conclusions or facts in a specific effort to discredit parents and caretakers, make it appear as if these parents or caretakers were not mentally fit to take care of children, and permanently separate these parents and caretakers from their children.

535.    At all times relevant hereto, Defendant ACDHS and its employees, including Defendant Niceta and Defendant Dossey, acted pursuant to the above policies or customs of depriving Plaintiff and all other similarly situated individuals of their civil rights.

536.    Defendants' actions and conduct, as outlined above, were a direct and proximate cause of the constitutional and civil rights deprivations suffered by Plaintiff and all other similarly situated individuals.

<u>**FOURTH CLAIM FOR RELIEF**</u>

**Deprivation of Rights Protected by Equal Protection Clause – All Defendants**

537.    Plaintiff incorporates herein by reference all of the allegations contained in the preceding and foregoing paragraphs of this pleading.

79

538.    Defendants treated Plaintiff and all other similarly situated individuals differently than it treated other individuals and families it investigated in which they did remove or attempt to remove children from their parents or other caretakers.

539.    Defendants treated Plaintiff and all other similarly situated individuals differently out of spite, retaliation, revenge, or another improper motive.

540.    Based upon the foregoing allegations, in other cases not involving Plaintiff and the putative class members, Defendants did not

- separate children from their parents or caretakers based upon anonymous allegations;

- separate children from their parents or caretakers based upon false allegations;

- separate children from their parents or caretakers merely because the parents or caretaker refused a caseworker's offer of alcoholic beverages or sexual advances;

- separate children from their parents or caretakers because the parent or caretaker had a criminal history;

- separate children from their parents or caretakers because the parent was hospitalized or needed medical treatment;

- separate children from their parents or caretakers because the parent was wrongfully arrested and briefly incarcerated;

- separate children from their parents or caretakers because the parent or caretaker voluntarily reported a concerning incident involving their child or children;

80

- separate children from their parents or caretakers because the parent or caretaker raised a complaint, requested that an internal investigation be opened, or otherwise raised an issue regarding the professionalism of an employee of Defendant ACDHS;

- separate children from their parents or caretakers because the parent or caretaker self-reported that they were in an abusive relationship;

- separate children from their parents or caretakers even when the parent or caretaker successfully completed a treatment plan, Safety Plan, or other required plan initiated by Defendant ACDHS; or

- separate children from their parents or caretakers because on the basis of false testimony, false evidence, or falsified investigatory documents.

541. Defendants' treatment of Plaintiff and all others similarly situated was irrational, abusive, and wholly unrelated to any legitimate governmental activity.

542. Defendants' differential treatment of Plaintiff and all other similarly situated individuals affected a fundamental right – namely, the right to raise, maintain, and be part of a family.

543. Defendants treated individuals other than Plaintiff and the putative class members more favorably when they did not separate or attempt to separate children involved in other investigations from their parents or caretakers.

544. There was no objectively reasonable basis for the differential treatment.

545. Defendants unequally applied applicable laws, statutes, and other policies to Plaintiff and all other similarly situated individuals when compared with other individuals and

families it investigated in which they did remove or attempt to remove children from their parents or other caretakers.

546.     Defendants' actions and conduct, as outlined above, were a direct and proximate cause of the constitutional and civil rights deprivations suffered by Plaintiff and all other similarly situated individuals.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff, Danielle Jurinsky, individually and on behalf of all other similarly situated individuals, prays:

(1)     for an Order certifying the C.R.C.P. 23 class, naming Danielle Jurinsky as class representative of the class, and naming the undersigned as class counsel;

(2)     for judgment in favor of Plaintiff and other similarly situated individuals and against Defendants Robin Niceta, Michelle Dossey, Arapahoe County Department of Human Services, Division of Child & Adult Protection Services, and Arapahoe County Board of County Commissioners, in an amount to be determined by the trier of fact for their losses as set forth above and for costs, expert witness fees, attorney's fees, filing fees, and pre- and post-judgment interest; and

(3)     such other further relief as the Court may deem appropriate, just, and proper.

Respectfully submitted on this 21st day of September, 2022.

<u>/s/ Elliot A. Singer</u>
Elliot A. Singer (#47490)
CONDUIT LAW, LLC
1660 Lafayette St.
Suite 4
Denver, CO 80218
Phone: (720) 432-7032
Facsimile: (720) 310-2224
Email: elliot@conduit.law
*Counsel for Plaintiff and Class Counsel*

## **CERTIFICATE OF SERVICE**

I certify that on September 21, 2022, this **AMENDED COMPLAINT** was filed via

CM/ECF which will serve same upon:

>    Writer Mott, Esq.
>    Rebecca Taylor, Esq.
>    *Counsel for Defendants*


>                          */s/ Elliot A. Singer*
>                          Elliot A. Singer